UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

MACKENZIE A. BRISTOW,

                    Plaintiff,          NO.  CV-05-0226-EFS

          v.
                                        **ORDER DENYING PLAINTIFF'S MOTION**
CITY OF SPOKANE, WASHINGTON,            **FOR PARTIAL SUMMARY JUDGMENT**
ROGER BRAGDON, and C.                   **MOTION AND GRANTING IN PART AND**
BRENDEN,                                **DENYING IN PART DEFENDANTS'**
                                        **MOTION FOR DISMISSAL, OR, IN THE**
                    Defendants.         **ALTERNATIVE, SUMMARY JUDGMENT**

     On August 10, 2006, the Court conducted a hearing in the
above-captioned case.  Before the Court were Plaintiff's Motion for
Partial Summary Judgment (Ct. Rec. 53) and  Defendants' Motion for
Dismissal, or, in the Alternative, Summary Judgment ("Defendants' Motion
for Summary Judgment") (Ct. Rec. 61). Appearing on behalf of Plaintiff
was Richard Wall.  Ellen O'Hara appeared on behalf of Defendants.  After
reviewing submitted materials and hearing oral argument, the Court was
fully informed.   The Court issued oral rulings on the parties'
respective motions; this Order serves to memorialize and supplement the
Court's oral rulings.

## I. Background

     Plaintiff, Mackenzie Bristow, worked as a Patient Account
Coordinator for Lincare, Inc. ("Lincare") in Spokane, Washington. (Ct.

ORDER– *1*

Rec. 51 at 1.)  Part of Plaintiff's job was to write handwritten letters to Lincare clients regarding lapses in their medical insurance and to notify clients of insurance payments to be applied to the clients' Lincare accounts.  *Id.* at 1-2.  On July 14, 2004, Plaintiff sent a handwritten notice to Beatrice Saldin, a Lincare client.  *Id.* at 2. Plaintiff wrote Beatrice Saldin's name on three places on this notice.

Between May 21, 2004, and May 23, 2004, Ms. Saldin was the victim of check fraud. (Ct. Rec. 78 Ex. D.)  On June 23, 2004, Ms. Saldin's daughter, Ms. Loal Meyers, reported to the police that her mother's checks were stolen and negotiated under forged signature. (Ct. Rec. 91-2 at 9.) On July 22, 2004, after receiving a Lincare notice prepared by Plaintiff, Ms. Meyers filed a supplemental crime report with the Spokane Police Department. (Ct. Rec. 78 at 10.)  In the report, Ms. Meyers stated her belief that Plaintiff's writing of "Beatrice Saldin" on the notice and the signature on the fraudulent checks were identical. *Id.* Ms. Meyers provided the checks and the notice to the Spokane Police Department. *Id.*

As a result of Ms. Meyers' report, Defendant C. Brenden, a detective in the City of Spokane Police Department Fraud Unit, began investigating.  (Ct. Rec. 65 ¶ 17.)  Defendant Brenden compared Plaintiff's handwritten notice to the fraudulent checks, looking for handwriting similarities. *Id.* at 18.  Defendant Brenden performed a "light table analysis" to see if he could match the writings by laying one document on top of the other document. *Id.*  In order to make the documents the same size, Defendant Brenden used a computer editing program. *Id.*  After completing his light table analysis, Defendant Brenden concluded the signatures on the two documents were similar

ORDER– *2*

enough to lead him to believe they were written by the same person. *Id.* Defendant Brenden then consulted three other Fraud Unit detectives. *Id.* at ¶ 19. All of the detectives agreed that the signatures were more than likely written by the same person. *Id.*

Defendant Brenden then called Lincare to advise the company he would be coming to its office to speak with Plaintiff. *Id.* at ¶ 20. Defendant arrived at Lincare on July 28, 2004, and spoke with Cindy White and Jana Sprague, Plaintiff's supervisors. *Id.* Defendant Brenden told Ms. White and Ms. Sprague about the case he was investigating and showed them the two sets of documents. *Id.* at 21. One of Plaintiff's supervisors allegedly exclaimed, "That's Mackenzie's handwriting!" *Id.*

Defendant Brenden claims Plaintiff consented to the presence of her supervisors during the interview. *Id.* Plaintiff, testified in her deposition that Defendant Brenden did not ask Plaintiff's permission, nor did she grant her permission, for her supervisors to be present during the interview. (Ct. Rec. 69 at 23.)

While questioning Plaintiff at Lincare, Defendant Brenden asked questions that implied possible motives for Plaintiff to forge Ms. Saldin's checks. (Ct. Rec. 65 ¶ 25.) Defendant Brenden allegedly asked Plaintiff "When was the last time you used drugs?" (Ct. Rec. 65 ¶ 25) and "When was the last time you used meth?" (Ct. Rec. 51 at 3). Furthermore, Defendant Brenden claimed a Washington State Patrol handwriting expert had examined Ms. Saldin's forged checks, compared the handwriting to Plaintiff's handwriting on the Lincare note, and concluded the handwriting on Ms. Saldin's checks had been forged by Plaintiff. *Id.* When Defendant Brenden mentioned one of the fraudulent checks was passed at PetCo, Plaintiff stated she had no reason to go to

ORDER- *3*

PetCo, which Defendant Brenden claims to have understood to mean Plaintiff did not own a pet. (Ct. Rec. 65 ¶ 23.)

At the end of the July 28, 2005, interview, Plaintiff volunteered to submit to a polygraph exam to prove she had not forged Ms. Saldin's checks. *Id.* at 26. Plaintiff also mentioned that her fingerprints were on file with the F.B.I. in connection with her previous employment at the Spokane International Airport. (Ct. Rec. 51 at 4.) Once Plaintiff left the room, Plaintiff's supervisors called Lisa Wegrzyn, Lincare's corporate attorney, and placed her on speaker phone to discuss the investigation. (Ct. Rec. 65 ¶ 27.) While on the phone call, Lincare officials asked Defendant Brenden if they should retain Ms. Bristow as an employee. *Id.* at ¶ 27. Defendant Brenden states that he was adamant in telling them they would be open to a lawsuit if they fired someone just because a police officer had talked to them at work. *Id.*

The following day, Plaintiff was placed on administrative leave by Lincare due to Defendant Brenden's allegation of criminal conduct. (Ct. Rec. 51 at 5.) Lincare allowed Plaintiff three weeks to clear up the allegations, otherwise her employment would be terminated. *Id.* Plaintiff called Defendant Brenden and left a voicemail regarding her situation. *Id.* Plaintiff told Defendant Brenden she would cooperate to the best of her ability to assist him in the investigation. *Id.*

Later that day, Defendant Brenden claims to have driven to Plaintiff's apartment to discuss her administrative leave. (Ct. Rec. 65 ¶ 31.) When Defendant Brenden arrived, no one answered the door and he walked to the back side of the apartment. *Id.* When Defendant Brenden looked inside, he noticed pet food bowls on the floor and a small white dog. *Id.* Based on this discovery, Defendant Brenden concluded Plaintiff

ORDER- *4*

lied during the interview when she stated she had no reason to go to PetCo, which was one of the places where Ms. Saldin's allegedly forged checks had been passed. *Id.* Defendant Brenden then contacted Plaintiff by telephone and they set up a polygraph exam for the following Tuesday, August 3, 2004. *Id.* at ¶ 32.

In the meantime, Plaintiff contacted approximately eight attorneys. (Ct. Rec. 51 at 5.) Each of these eight attorneys advised Plaintiff not to take a polygraph exam unless certain conditions were met to ensure the accuracy of the exam. *Id.* Ultimately, Plaintiff retained Doug Phelps as her attorney. *Id.* On Monday, August 2, 2004, the day before Plaintiff was scheduled to take her polygraph exam, Plaintiff claims she called Defendant Brenden to reschedule the exam to ensure the conditions recommended by Mr. Phelps would be met. *Id.* at 6. Specifically, Plaintiff wanted to make sure Mr. Phelps would be allowed to witness the polygraph exam. *Id.* In contrast, Defendant Brenden claims Plaintiff's message indicated she could not take the exam. (Ct. Rec. 65 ¶ 34.) When Defendant Brenden followed up for clarification as to whether Plaintiff was cancelling or simply postponing the exam, Defendant Brenden claims Plaintiff advised him that she had retained Mr. Phelps as her attorney and Mr. Phelps told her not to take the polygraph exam at all. *Id.*

The next day Plaintiff was arrested and transported to the Spokane County Jail. (Ct. Rec. 51 at 6.) Defendant Brenden allegedly stated he had scanned the signature on the check and the handwriting on the Lincare letter into a computer and overlaid them "just like on CSI" and that the signatures were exactly the same. *Id.* at 7. Plaintiff was charged with one count of forgery and spent one night in jail before being released the following day. (Ct. Rec. 65 ¶ 35.)

ORDER- *5*

On August 10, 2004, Defendant Brenden filed a charging request. (Ct. Rec. 91 at 60.)  Attached to the request was an additional report providing a summary of the case and Defendant Brenden's reasons for believing Plaintiff should be charged with forgery.  *Id.*  Specifically, Defendant Brenden reported: (1) he compared the signature on the allegedly forged checks with the Lincare note and found they were an "exact duplicate" and that after using computer software to make the writing the same size, determined "them to be the one in the same signature;" and (2) Plaintiff originally agreed to take a polygraph exam and later told Defendant Brenden "she was no longer going to take the polygraph." (Ct. Rec. 91-2 at 66.)

Lincare terminated Plaintiff's employment on August 20, 2004, based on her inability to resolve the criminal charges by the end of the three week temporary suspension.  (Ct. Rec. 69, Exhibit F.)

Shortly after being charged with forgery, Plaintiff hired Ted Pulver, owner and operator of Pulver Investigations and Polygraphs. (Ct. Rec. 52 at 2.)  Mr. Pulver's investigation found Ms. Saldin's home had been burglarized and the forged checks were likely taken during the burglary.  *Id.*  Mr. Pulver noticed that the checks had been written in small amounts to local merchants, which was a strong indication to Mr. Pulver that the checks were being used by the same person who had stolen the checks or a person close to that person. *Id.* at 3.

Mr. Pulver relayed his findings and conclusions to Defendant Brenden.  *Id.*  Defendant Brenden allegedly responded that he was absolutely certain Plaintiff had forged the checks based on (1) his comparison of the checks and the Lincare note and (2) that he believed the checks had been passed in close proximity to Plaintiff's place of

ORDER- *6*

work in North Spokane.  *Id.*

Defendant Brenden provided Mr. Pulver with copies of the checks and the Lincare note.  *Id.*  Mr. Pulver then went to the businesses where the checks were passed and discovered the stores were located in Spokane Valley, not North Spokane, where Plaintiff worked.  *Id.* at 4.  While at Rite Aid, one of the places where a check was passed, Mr. Pulver learned it was common practice to get a phone number for each accepted check.  *Id.*  In his investigation, Mr. Pulver learned that the subscriber of the phone number was Phillip Caputo, a person with a current arrest warrant for a pending drug charge and a criminal history, including burglary, theft, and drug charges.  *Id.* at 5.  Mr. Pulver's investigation also revealed that Mr. Caputo's current address was within one mile of the Petco, Rosaurs, and Rite Aid, stores where Ms. Saldin's checks had been passed.  *Id.*

Some time later, Mr. Pulver provided the results of his investigation and the results of a polygraph exam to Douglas Orr, Ph.D., the chief polygrapher for the Spokane Police Department. (Ct. Rec. 52 at 6.)  Mr. Pulver asked Dr. Orr to convey the results to Defendant Brenden.  *Id.*  Mr. Pulver followed up with Dr. Orr several days later and asked Dr. Orr whether he had passed the information on to Defendant Brenden.  *Id.*  Dr. Orr confirmed he had passed the information on, but that Defendant Brenden allegedly stated he did not care about the results of Mr. Pulver's investigation and that Defendant Brenden intended to go forward with the prosecution of Plaintiff because Defendant Brenden had more than enough information to prove Plaintiff's guilt.  *Id.*

On September 22, 2004, Prosecutor Mounsey filed an information

ORDER- 7

charging Plaintiff with six counts of forgery. (Ct. Rec. 65 ¶ 37.) On May 2, 2005, Prosecutor Mounsey moved the court for an order dismissing the September 22, 2004, information. (Ct. Rec. 69 Ex. E.)

On June 6, 2005, Lincare rehired Plaintiff to work in a different office. (Ct Rec 51 at 7 & Ct. Rec. 69 Ex. F.) Thereafter, on August 1, 2005, Plaintiff filed this suit. (Ct. Rec 1.)

## II. Defendants' Motion

Defendants initially request dismissal based on Plaintiff's failure to state a claim for which relief may be granted. FED. R. CIV. P. 12(b)(6). Defendants' Motion does not indicate in what respect Plaintiff's complaint is deficient; therefore, this request is denied. Defendants alternatively request summary judgment on the issues addressed below.

A. Summary Judgment Standard

Summary judgment will be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When considering a motion for summary judgment, a court may not weigh the evidence nor assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine issue for trial exists only if "the evidence is such that a reasonable jury could return a verdict" for the party opposing summary judgment. *Id.* at 248. In other words, issues of fact are not material and do not preclude summary judgment unless they "might affect the outcome of the suit under

ORDER— *8*

the governing law." *Id.* There is no genuine issue for trial if the evidence favoring the non-movant is "merely colorable" or "not significantly probative." *Id.* at 249.

If the party requesting summary judgment demonstrates the absence of a genuine material fact, the party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial" or judgment may be granted as a matter of law. *Anderson*, 477 U.S. at 248. This requires the party opposing summary judgment to present or identify in the record evidence sufficient to establish the existence of any challenged element that is essential to that party's case and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Failure to contradict the moving party's facts with counter affidavits or other responsive materials may result in the entry of summary judgment if the party requesting summary judgment is otherwise entitled to judgment as a matter of law. *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir. 1996).

B. Qualified Immunity

Defendants seek qualified immunity with regard to Plaintiff's 42 U.S.C. § 1983 claims. Qualified immunity shields government officials, including police officers, who are performing discretionary functions "from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Harris v. City of Roseburg*, 664 F.2d 1121, 1127 (9th Cir. 1981) (extending the privilege of qualified immunity to police officers). When confronted with a claim of qualified immunity, a court

ORDER- *9*

must ask: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

"[I]f a violation could be made out [under the first inquiry] on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." *Id.*

*1. Defendant Brenden's Arrest of Plaintiff*

Defendants seek qualified immunity for their decision to arrest Plaintiff.  The first step in the qualified immunity analysis is to determine whether the facts alleged show the officer's conduct violated a constitutional right. *Saucier,* 533 U.S. at 201. Here, Plaintiff alleges her Fourth Amendment right to be free from unreasonable searches and seizures was violated.

The Fourth Amendment guarantees citizens the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV.  This includes the right to be free from unreasonable arrests. *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).  A warrantless arrest is unreasonable under the Fourth Amendment if it is made without probable cause. *Mackinney v. Nielson*, 69 F.3d 1002, 1005 (9th Cir. 1995). "Probable cause exists when the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a prudent person to believe that a suspect has committed, is committing, or is about to commit a crime." *Id.* (quoting *United States v. Hoyos*, 892 F.2d 1387, 1392 (9th Cir. 1989), *cert. denied*, 498 U.S. 825 (1990) (citation omitted)).

Thus to determine whether a violation of Plaintiff's Fourth Amendment rights occurred, the Court must determine whether, in the

ORDER— *10*

light most favorable to Plaintiff, the facts and circumstances within Defendant Brenden's knowledge, at the time Ms. Bristow was arrested, would have prevented a prudent person from believing it was more probable than not that Plaintiff had committed the forgeries. *See Hoyos*, 892 F.2d at 1392; *Mackinney*, 69 F.3d at 1005.

Viewed in the light most favorable to Plaintiff, the information available to Defendant Brenden at the time of Plaintiff's arrest was (1) Plaintiff worked at a company whose client had been the victim of check fraud; (2) examples of Plaintiff's writing of Ms. Saldin's name on the Lincare note was strikingly similar to the signature on Ms. Saldin's fraudulently passed checks; (3) Plaintiff volunteered to aid in the investigation, including offering to take a polygraph test and providing information that her fingerprints were on file; (4) Plaintiff vehemently denied guilt; (5) Plaintiff may not have had an opportunity to obtain the checks; and (6) Plaintiff had no apparent motive, such as drug use.

Given this analysis, it is possible to conclude that Defendant Brenden failed to meet the threshold for probable cause. Without probable cause, the arrest would have been unreasonable. *See Mackinney,* 69 F.3d at 1005. An unreasonable arrest violates the Fourth Amendment's prohibition on illegal searches and seizures. Therefore, Plaintiff presents sufficient facts to make out a prima facie case of a constitutional violation.

*2. A Clearly Established Right*

Under *Saucier*, the next test is whether the constitutional right is clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that

ORDER- *11*

his conduct was unlawful in the situation he confronted.") Thus, the second step requires the Court to ask if a reasonable officer would know that an arrest without probable cause would be unlawful.

As discussed above, probable cause is the foundation of what is "unreasonable" under the Fourth Amendment. *Mackinney,* 69 F.3d at 1005. It is so intertwined with Fourth Amendment jurisprudence that every officer would or should know that probable cause is required to arrest a suspect when an officer does not have a warrant. Additionally, a reasonable officer would know that in order to have probable cause the totality of evidence must make it more probable than not that the suspect committed or was about to commit a crime. *Hoyos*, 892 F.2d at 1392.

Not only is the Fourth Amendment's probable cause requirement clearly established, but Defendant Brenden makes no claim that he is unaware of the probable cause requirement. In fact, it is clear from the record that Defendant Brenden understood that probable cause was required in order to arrest Plaintiff. (See Ct. Rec. 91 Exhibit B at 66; Ct. Rec. 91 Exhibit A at 48.) Thus, Plaintiff makes out a prima facie case of a violation of a clearly established constitutional right.

*3. Misapprehension of the Law*

If a law enforcement officer reasonably misapprehends the law governing the disputed circumstances, the officer will be immune from suit. *Brosseau*, 543 U.S. at 198. This exception is premised on the fact that it is sometimes difficult for an officer to determine how a particular legal doctrine applies to the situation the officer faces. *Saucier,* 533 U.S. at 205.

Here, Defendant Brenden did not need to make a split-second

ORDER– *12*

decision to protect the safety or property of others.  This was not a violent crime.  Despite obtaining no additional evidence to establish that it was more likely than not that Plaintiff committed the forgeries, Defendant Brenden arrested Plaintiff less than a week after receiving an example of Plaintiff's handwriting and establishing the belief that the handwriting exemplar was similar to the handwriting on the fraudulently passed checks.  In balancing the public interest and an individual's right to personal security free from arbitrary interference by law enforcement officers, the Court concludes Plaintiff presented sufficient facts to establish a genuine issue of material fact as to whether Defendant Brenden's arrest of Plaintiff at this stage of the investigation, was justified by any potential misapprehension of the requirement for probable cause.

*4. Qualified Immunity Conclusion*

An arrest without probable cause violates the Fourth Amendment. The contours of Fourth Amendment jurisprudence clearly establish that probable cause must be present for an arrest and a reasonable official would understand that an arrest without probable cause violates the Fourth Amendment. *Saucier*, 533 U.S. 194; Moe, 97 Wash. App. 950. Viewing the evidence before the Court, in the light most favorable to Plaintiff, it is possible to conclude that Defendant Brenden lacked probable cause to arrest Plaintiff.  An arrest without probable cause violates a clearly established right and the circumstances do no justify misapprehension of the law.  Consequently, the Court denies Defendants' motion for qualified immunity on Plaintiff's due process claim.

C. Failure to Train

Defendants move for summary judgment on Plaintiff's failure to
ORDER– *13*

train claim.    Defendants assert that Chief Bragdon did not violate Plaintiff's civil rights because all of his officers received specific training in fraud investigation.    Plaintiff claims the failure to train the Fraud Unit detectives to employ methodologies used in the scientific analysis of handwriting or to rely on analysis from handwriting experts constitutes deliberate indifference to the rights of citizens of Spokane.    Thus, the question before the Court is whether Defendant City of Spokane and Defendant Bragdon's failure to train Defendant Brenden in handwriting analysis constitutes a failure to train.

The Supreme Court held in *City of Canton v. Harris* that a municipality is subject to liability "only where the failure to train amounts to a deliberate indifference to the rights of persons with whom the police come into contact."    489 U.S. 378, 388 (1989).    The Ninth Circuit outlined the test for municipal liability under § 1983 holding the person alleging injury must show:

> (1) that he possessed a constitutional right of which he was deprived; (2) that the [City] had a policy; (3) that the policy 'amounts to deliberate indifference to [the party claiming injury's] constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.' (Citations omitted.)

*Anderson v. Warner,* 451 F.3d 1063, 1070 (9th Cir. 2005).

The Court in *Harris* held that deliberate indifference can stem from a situation where the need for more or different training is obvious and the inadequacy is likely to result in the violation of constitutional rights.    *Harris,* 489 U.S. at 390.    Nevertheless, it will not suffice to prove that an injury or accident could have been avoided if an officer had been better trained. *Id.* at 391.

In the case at bar, as previously discussed, when the evidence is
ORDER- *14*

viewed in Plaintiff's favor, Plaintiff makes out a prima facie case of deprivation of a constitutional right; Plaintiff had a right to be free from an unreasonable arrest and it was potentially violated when Defendant Brenden arrested her.  Thus, the focus of the Court's inquiry in regard to Defendants' summary judgment motion for failure to train is (1) whether the City had a policy, (2) whether that policy amounted to deliberate indifference, and (3) whether the policy was the moving force behind the constitutional violation.

### 1. The City's Policy

The Court in *Harris* found the "focus must be on adequacy of the training program in relation to the tasks the particular officers must perform," and whether training found to be inadequate can justifiably be said to represent city policy.  489 U.S. at 390-391.  The Supreme Court has found that a "policy" is a course of action consciously chosen from among various alternatives. *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).

Given the widespread use of handwriting analysis, the City and Defendant Bragdon had various choices.  The City and Defendant Bragdon could have (1) trained officers in certain methods of handwriting analysis, (2) required the officers to submit handwriting exemplars to handwriting experts, or (3) provided no training.  The affidavits of Defendant Brenden and his fellow Fraud Unit officers make clear that the officers in the fraud unit regularly rely on their own handwriting analysis as a part of their jobs. (Ct. Rec. 65 at 4; Ct. Rec. 66 at 4; Ct. Rec. 67 at 4-5; Ct. Rec. 68 at 3.)  The widespread use of individualized handwriting analysis demonstrates a city policy to allow

ORDER– *15*

officers to use their own judgment in an investigation and a determination of probable cause for an arrest.

*2. Deliberate Indifference resulting in Failure to Train*

Liability can only be found when the policy constitutes "deliberate indifference." *Harris,* 489 U.S. at 388. In determining whether there is deliberate indifference the focus must be on the adequacy of the training for the tasks performed by the officers. *Id.* The affidavits of the officers make clear that a regular part of the officers' jobs is to analyze handwriting. While there are some controversies regarding the accuracy of handwriting analysis, the field is moving towards standardization. The American Society for Testing and Materials established a methodology that produces acceptable error rates under the *Daubert* standard. *U.S. v. Prime,* 431 F.3d 1147, 1154-55 (9th Cir. 2005).

Plaintiff claims the handwriting analysis performed by Defendant Brenden fails to meet the standards employed by the handwriting experts. There are accepted methodologies of handwriting analysis that result in relatively low error rates. One expert, Chris Baggett, found that Defendant Brenden's handwriting analysis had no scientific validity. (Ct. Rec. 91 at 83.) The other expert, Hannah MacFarland, found significant differences in the handwriting and to conclude common authorship would have been akin to concluding two people of the same ethnic group are the same person. (Ct. Rec. 91 at 100-101.)

The City and Defendant Bragdon failed to train Fraud Unit investigators with regard to the accepted method of handwriting analysis, yet they depend on detectives to perform handwriting analysis

ORDER– *16*

in their normal course of work.  Because of this, a reasonable jury could find that a failure to train Fraud Unit detectives on accepted practices of handwriting analysis amounted to "deliberate indifference." Accordingly, Defendants' motion is denied in part.

D. False Arrest and False Imprisonment

Defendants move for summary judgment on Plaintiff's false arrest and false imprisonment claims.  Defendants argue they did not commit the torts of false arrest or false imprisonment because probable cause existed to arrest Plaintiff.

"The gist of an action for false arrest or false imprisonment is the unlawful violation of a person's right of personal liberty or the restraint of that person without legal authority[.]" *Bender v. City of Seattle*, 99 Wash. 2d 582, 591 (1983).  "[P]robable cause is a complete defense to an action for false arrest and imprisonment." *Hanson v. City of Snohomish*, 121 Wash. 2d 552, 563-64 (1993) (citing *Bender,* 99 Wash. 2d at 592).

For the same reasons discussed above with regard to Defendants claim for qualified immunity, when all evidence is taken in the light most favorable to Plaintiff, the Court finds that a reasonable jury could conclude that probable cause did not exist to arrest Plaintiff. Consequently, Defendants' motion for summary judgment on Plaintiff's false arrest and false imprisonment claim is denied.

E. Defamation

Plaintiff's defamation claim is based, in part, on Defendant Brenden's statement in front of Plaintiff's Lincare supervisors that a Washington State Patrol handwriting expert determined Plaintiff had

ORDER– *17*

forged Ms. Saldin's checks. (Ct. Rec. 51 at 3-4.)  Plaintiff also claims she was defamed by Defendant Brenden's statements on the Charging Request and Affidavit of Facts, in which Defendant Brenden stated that the signatures on the forged checks and the Lincare Note were "exact duplicates," "one and the same," and the "exact same signature." (Ct. Rec. 56 at 17.)  Both parties provided supplemental briefing on the later defamation issue.  Below is the Court's analysis and rulings on the two separate defamation issues.

*1. Comments in Front of Plaintiff's Supervisors*

In order to establish a defamation claim, a plaintiff must prove: (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages. *Moe v. Wise*, 97 Wash. App. 950, 957 (Wash. Ct. App. 1999). While law enforcement officers are entitled to a qualified privilege, *Turngren v. King County*, 104 Wash. 2d 293, 309 (1985), knowing the matter to be false or acting in reckless disregard as to its truth or falsity abolishes qualified immunity. *Moe*, 97 Wash. App. 950, 963. Any communication of a defamatory statement constitutes "publication." *Pate v. The Tyee Motor Inn*, 77 Wash. 2d 819 (1970).  A non-public figure need only establish negligence on the part of the person who published the defamatory statement. *Bender*, 99 Wash. 2d 582, 599.

The principal defenses to an action for defamation are truth, consent, absolute privilege, qualified or conditional privilege, and fair comment or privileged criticism. *Jolly v. Valley Publ'g Co.*, 63 Wash. 2d 537, 541 (1964).  Here, Defendants employ a self-defense of consent, claiming Plaintiff consented to having her supervisors in the room.

ORDER- *18*

Whether Plaintiff consented is in dispute. Plaintiff claims she did not consent (Ct. Rec. 69 at 23) and Defendants claim Plaintiff consented (Ct. Rec. 65 at 22); consequently, there is an issue of material fact in dispute. Therefore, the Court denies Defendants' motion for summary judgment regarding the statements made in front of her supervisors.

*2. Statements in the Charging Request*

During oral argument, the Court ordered additional briefing on the issue of defamation with regard to Defendant Brenden's charging request. Both sides submitted briefs and the Court outlines its opinion below.

Plaintiff claims Defendant Brenden defamed her in the charging request through his statements that Plaintiff's handwriting on the Lincare note and the handwriting on Ms. Saldin's fraudulently passed checks were "an exact match," were "identical," and were "one and the same." (Ct. Rec. 95 at 3.) Plaintiff claims Defendant Brenden later admitted that the signatures were actually merely similar enough to conclude they had been written by the same person. (Ct. Rec. 91 at 36.) Plaintiff claims that the difference between stating that the signatures were identical and believing that they were written by the same person demonstrates a lie in Defendant Brenden's charging request, or at least a statement with reckless disregard for the truthfulness of those statements. (Ct. Rec. 95 at 3.)

Here, Defendants assert a defense of qualified or conditional privilege. Defendants argue Defendant Brenden should be immune from liability on this issue because the charging request is performed as part of his job duties.

ORDER– *19*

The Ninth Circuit has held that investigatory functions are not entitled to absolute immunity. *Milstein v. Cooley,* 257 F. 3d 1004 (9th Cir. 2001). Under qualified immunity, government officials are not subject to damages liability for the performance of their discretionary functions when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Buckley,* 509 U.S. at 268. The qualified immunity standard is meant to "protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Id.* (Internal quotations omitted.)

In this case, the issue is whether there is a substantial enough difference between stating that the signatures were identical, and stating that Defendant Brenden believed they were written by the same person, to constitute a false statement. Plaintiff has not alleged that Defendant Brenden did not believe Plaintiff committed the forgeries. Defendant Brenden was not alone in his belief that the signatures were the same. Defendant Brenden's fellow Fraud Unit detectives, Ms. Meyers, and one of Plaintiff's supervisors believed the handwriting belonged to Plaintiff. In addition, Defendant Brenden allowed the prosecutor to form independent conclusion as to the handwriting by attaching copies of the fraudulently passed checks and the Lincare note to the charging request. Attaching the documents supports Defendant Brenden's belief that the signatures are strikingly similar and that anyone looking at the signature would agree. Consequently, it appears that Defendant Brenden may have exaggerated in his statements, but his actions to get additional opinions on the handwriting similarities demonstrate that his

ORDER– *20*

statements were not made with reckless disregard as to their truth.

Additionally, Plaintiff failed to provide any evidence that the outcome would have been different if Defendant Brenden had said he thought the signatures were strikingly similar as opposed to identical. There is nothing in the record that indicates the prosecutor would not have filed charges if Defendant Brenden had used slightly different language in his charging request.

Thus, because qualified immunity protects officers in the vigorous pursuit of their job, the Court grants Defendants' motion for summary judgment on Plaintiff's defamation claim as to the statements in the charging report.

F. Negligent Investigation

Defendants claim that the true gist of Plaintiff's complaint is based in Plaintiff's belief the criminal investigation was negligent and that Defendants should have consulted with one or more handwriting experts.  In Washington, the tort of negligent investigation does not exist. *Fondren v. Klickitat*,79 Wash. App. 850, 862 (1995). Plaintiff's claims are appropriately defined as false arrest, false imprisonment and defamation.  Therefore, the Court grants Defendants' motion with regard to the issue of negligent investigation.

G. Economic Damages

Defendants claim Plaintiff's economic damages stem from the actions of Lincare Corp.'s decision to terminate her employment and not from Defendants' alleged misconduct.  According to Defendants, because Washington is an at-will employment state, an employer can discharge an employee without liability. *Thompson v. St. Regis Paper Co.*, 102 Wash.

ORDER- *21*

2d 219, 223 (1984).

Plaintiff is suing for specific violations of her constitutional rights and for state tort claims. Her calculation of damages may include loss of income based on losing her job subsequent to her arrest. Consequently, the Court denies Defendants' motion to rule as a matter of law that Plaintiff is denied from recovery for any damages incurred from Lincare's termination of her employment.

### III. Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves the Court for an order finding qualified immunity may not be granted for Defendants and for summary judgment on her state claims of false arrest and false imprisonment and defamation.

A. Qualified Immunity

Because, as described above, the Court finds that an issue of material fact exists with regard to the defense of qualified immunity, Plaintiff's motion for summary judgment with respect to qualified immunity is moot and is denied as such.

B. False Arrest and False Imprisonment

Plaintiff moves the Court for summary judgment on her false arrest and false imprisonment claims, arguing that the undisputed facts establish that Defendant Brenden did not have probable cause to arrest her. The Court finds there is not conclusive evidence for either a finding that probable cause existed or did not exist. Therefore, Plaintiff's motion for summary judgment on this issue is denied.

C. Defamation

In regard to the statements made in front of Plaintiff's supervisors, the Court finds there are material facts in dispute as to

ORDER- *22*

whether Plaintiff consented to the presence of her supervisors, consequently Plaintiff's motion is denied on this defamation issue. As to the statement in the charging request, for the reasons enumerated under the Court discussion of Defendants' summary judgment motion on this issue, the Court granted the Defendants' motion for summary judgment. Therefore, Plaintiff's motion for summary judgment with regard to the alleged defamation in the charging request is denied as moot.

Accordingly, **IT IS HEREBY ORDERED**:

1. Plaintiff's Motion for Partial Summary Judgment **(Ct. Rec. 53)** is **DENIED.**

2. Defendants' Motion for Dismissal, or, in the Alternative, Summary Judgment **(Ct. Rec. 61)** is **GRANTED IN PART (Motion for Summary Judgment on the defamation claim arising from the charging report and the issue of negligent investigation)** and **DENIED IN PART (all other issues).**

**IT IS SO ORDERED.** The District Court Executive is directed to enter this Order and provide copies to counsel.

**DATED** this 16th day of October 2006.

_____s/ Edward F. Shea_____
EDWARD F. SHEA
UNITED STATES DISTRICT JUDGE

Q:\LawClerk\Rory\Civil\2005\0226.Order.SJM.wpd

ORDER– *23*